IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**NANCY G. ASH,**                                3:12-cv-02017- RE

Plaintiff,                          **OPINION AND ORDER**

v.

**CAROLYN W. COLVIN,**
Acting Commissioner of Social Security,

Defendant.

**REDDEN**, Judge:

Plaintiff Nancy G. Ash ("Ash") brings this action to obtain judicial review of a final

decision of the Commissioner of the Social Security Administration ("Commissioner") denying

her claim for disability insurance benefits ("DIB"). For the reasons set forth below, the decision

of the Commissioner is affirmed and this matter is dismissed .

1 - OPINION AND ORDER

## BACKGROUND

Ash filed her application for DIB on March 4, 2009, alleging disability since March 22, 2008, due to "[h]ead, shoulder, knees, arms, legs, hips, pelvis I got hit in a cross walk and was through [sic] 15 feet on March 22, 2008 and have been in pain sence [sic]. I was hit by a car in a cross walk and it damaged my body." Tr. 135. Ash was 48 years old on her alleged onset date. She has two years of college. Tr. 39. Her application was denied initially and upon reconsideration. A hearing was held on July 7, 2011. The Administrative Law Judge ("ALJ") found her not disabled. Tr. 20-28. Ash's request for review was denied, making the ALJ's decision the final decision of the Commissioner.

## ALJ's DECISION

The ALJ found Ash had the medically determinable severe impairments of fibromyalgia, carpal tunnel syndrome, and depression/bipolar disorder. Tr. 22.

The ALJ found that Ash's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1. Tr. 23.

The ALJ determined Ash retained the residual functional capacity ("RFC") to perform a reduced range of light work, unskilled, with occasional climbing, balancing, stooping, kneeling, crouching, crawling, and occasional use of the bilateral upper extremities. Tr. 24.

The ALJ found Ash could not perform her past relevant work as an apartment manager, office manager, or administrative assistant, but was capable of working as an economy hostess, usher, or information clerk. Tr. 28.

Ash argues that the ALJ erred by: (1) finding her not fully credible; (2) improperly

assessing her RFC; (3) failing to find her disabled under the "Grids;" and (4) improperly

weighing lay testimony.

## DISCUSSION

### I. Credibility

The ALJ is responsible for determining credibility, resolving conflicts in medical

testimony, and for resolving ambiguities. *Andrews v. Shalala,* 53 F3d 1035, 1039 (9ᵗʰ Cir 1995).

However, the ALJ's findings must be supported by specific, cogent reasons. *Reddick v. Chater,*

157 F3d 715, 722 (9ᵗʰ Cir 1998). Unless there is affirmative evidence showing that the claimant

is malingering, the Commissioner's reason for rejecting the claimant's testimony must be "clear

and convincing." *Id.* The ALJ must identify what testimony is not credible and what evidence

undermines the claimant's complaints. *Id.* The evidence upon which the ALJ relies must be

substantial. *Reddick,* 157 F3d at 724. *See also Holohan v. Massinari,* 246 F3d 1195, 1208 (9ᵗʰ

Cir 2001). General findings (e.g., "record in general" indicates improvement) are an insufficient

basis to support an adverse credibility determination. *Reddick* at 722. *See also Holohan,* 246

F3d at 1208. The ALJ must make a credibility determination with findings sufficiently specific

to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony.

*Thomas v. Barnhart,* 278 F3d 947, 958 (9ᵗʰ Cir 2002).

In deciding whether to accept a claimant's subjective symptom testimony, "an ALJ must

perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the

claimant's testimony regarding the severity of her symptoms." [Footnote omitted.] *Smolen v.*

*Chater,* 80 F3d 1273, 1281 (9ᵗʰ Cir 1996).

3 - OPINION AND ORDER

> Under the *Cotton* test, a claimant who alleges disability based on
> subjective symptoms "must produce objective medical evidence
> of an under-lying impairment which could reasonably be
> expected to produce the pain or other symptoms alleged...."
> *Bunnell,* 947 F.2d at 344 (quoting 42 U.S.C. § 423(d)(5)(A) (1988));
> *Cotton,* 799 F.2d at 1407-08. The *Cotton* test imposes only
> two requirements on the claimant: (l) she must produce objective
> medical evidence of an impairment or impairments; and (2)  she
> must show that the impairment or combination of impairments
> *could reasonably be expected to* (not that it did in fact) produce
> some degree of symptom.

*Smolen,* 80 F.3d at 1282.

The ALJ found Plaintiff not credible to the extent that her allegations exceed the RFC.

Tr. 25. Ash testified that she has a driver's license but generally does not drive because "driving

is very very scary for me," and causes anxiety since she was hit by a car in March 2008 and

hospitalized for five days with contusions and soft tissue injuries. Tr. 45.  She stated that she

gets up around noon and takes her medication, then tries to do some housework like the dishes,

but her hands cramp and she drops dishes.  She tries to do light housework for ten to fifteen

minutes and then usually goes back to bed because she is depressed. Tr. 51.  Her husband does

most of the housework, and has to help her do buttons, snaps and zippers. Tr. 46.

Ash testified that she can no longer quilt because her hands cramp.  Her husband does

most of the cooking because she drops cooking utensils.  She cannot grip with either hand,

though it's worse in the dominant right hand.  Ash stated she has good days and bad days, and on

a good day she might buy a gallon of milk, but she is unable to carry a case of soda pop. Tr. 47.

Ash testified she no longer goes out and she no longer takes photographs and makes photograph

albums because her "hands don't work." *Id.*  She can stand for about ten to fifteen minutes

before she needs to sit down because of pain in her hips or knees. Tr. 48.  She is in pain when

sitting, and cannot sit through a half hour television show. Tr. 49. Reading causes headaches. Her husband helps her with the laundry. Tr. 50. She can pick a piece of paper up from the floor but it's "very painful." Tr. 52. Sometimes she uses a cane when she goes out. It hurts to reach shoulder high. She cut her hair because she could not take care of it. Tr. 53. She takes Oxycontin, Oxycodone, Flexeril, and Savilla, and has no side effects from the medications. Tr. 55. She had physical therapy after the accident, but cannot do the home exercises because "it was too painful...it hurts the joints really, really bad." *Id.* Ash testified she was "hard to get along with because I just I cry a lot. I would get angry because I am the way I am." Tr. 56. Since the accident, she has headaches at least twice a month that can last three to four days at a time, and when she has them she can't eat and she throws up. Tr. 57. She cannot tolerate smells or noise.

Ash testified that she has audio hallucinations where she hears voices or music at least three times a week. Tr. 58. She didn't tell her physicians about the voices until 2010 because she was afraid her doctors would think she was crazy. Sometimes she will sleep for three or four days at a time because of depression and shame. Tr. 60. Four or five times a week she does not get dressed. Tr. 61.

The Commissioner argues the ALJ identified clear and convincing reasons to find Ash less than fully credible as to the extent of her limitations:

## A. Symptoms Controlled by Medication

Plaintiff testified that her pain made her unable to stand for more than 15 minutes, and her medications caused no side effects. Tr. 48, 55. The ALJ stated that "the medical records reveal that the medications have been relatively effective in controlling the claimant's symptoms.

5 - OPINION AND ORDER

Indeed, the claimant repeatedly reported Oxycontin controlled her pain." Tr. 26. The ALJ cited

a June 2009 note from treating physician Melvin D. Herd, M.D., Ph.D., who wrote "[p]atient

states her pain is controlled with the OxyContin. She feels that the current dosing is adequate to

control her pain." Tr. 272. The AJL also cited a December 2010 note from Dr. Herd:

> Patient's pain has been controlled on the OxyContin. She's had
> some insurance issues and the insurance wanted to change her
> 2 other medications....Patient has worked out these issues and that
> her daughter will be paying for her OxyContin. Patient states she
> is stable on the OxyContin and wishes to stay on that at this time.

Tr. 383.

The ALJ properly weighed this inconsistency between Plaintiff's pain testimony and her

reports to her doctors against Plaintiff's credibility.

## B. Conservative Treatment

The ALJ found Ash "has not generally received the type of medical treatment one would

expect for a totally disabled individual." Tr. 26. Conservative treatment can be "sufficient to

discount a claimants' testimony regarding [the] severity of an impairment." *Parra v. Astrue,* 481

F.3d 742, 750-51 (9th Cir 2007)(*quoting Johnson v. Shalala,* 60 F.3d 1428, 1434 (9th Cir. 1995)).

The Commissioner points to Ash's testimony that she had not had any injections as evidence of a

lack of aggressive treatment.

However, the record indicates Plaintiff had no medical insurance in March 2009. Tr. 274.

She had some improvement on Savella, but had no money to refill the prescription in July 2009.

Tr. 293. The lack of additional medical treatment is not a clear or convincing reason to find

Plaintiff less than fully credible.

/ / /

6 - OPINION AND ORDER

## C. Medical Evidence

The ALJ stated that Ash's complaints were not consistent with the objective findings. Tr. 26. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari,* 261 F.3d 853, 857 (9th Cir. 2001). The ALJ noted physical examination revealed positive Tinel's and Phalen's signs bilaterally. Tr. 25. However, the ALJ also noted May 2010 xrays showed "minimal osteoarthrosis" of the wrists and left hand. Tr. 26, 415. The ALJ cited June and July 2009 physical examinations in which Plaintiff had a normal gait and station.

The ALJ stated "an August 14, 2009 treatment note characterized the claimant's fibromyalgia as clinically stable. Exhibit 6F, page 2." Tr. 26. However, Exhibit 6F, page 2, is a July 14, 2009 treatment note from Gordon E. Banks, Ph.D., M.D., in which Dr. Banks assesses "Fibromyalgia. Clinically, the condition is improving." Tr. 293. On August 14, 2009, Dr. Herd noted "Patient's pain is controlled by her current medications." Tr. 394.

The ALJ stated a "June 2, 2011 mental status examination indicated the claimant had a grossly intact recent memory. Exhibit 9F, pages 1-2. Such evidence renders the claimant's allegations of disability less than fully credible." Tr. 26. Exhibit 9F is a June 2, 2011, psychiatric assessment by Steven Goldsmith, M.D., in which he found Plaintiff alert, calm, with normal speech, a depressed affect with logical associations, no suicidal ideation, no hallucinations or delusions, with memory for recent events grossly intact. Tr. 300. Dr. Goldsmith's impression was "[c]hronically depressed woman with BPD [bipolar disorder] more depressed since accident that produces physical disability and marked pain and also has taken

7 - OPINION AND ORDER

from her her usual physical coping strategies in terms of activities, work, etc." Tr. 301. Dr.
Goldsmith diagnosed Bipolar II disorder, depressed, and assessed a GAF of 45.

The ALJ's determination that the medical evidence did not support Plaintiff's symptom
testimony is supported by substantial evidence and is a clear and convincing reason to find
Plaintiff less than fully credible.

## II. Residual Functional Capacity

The ALJ found Ash had the residual functional capacity to perform a reduced range of
light work, restricted to unskilled work, with only occasional climbing, balancing, stooping,
kneeling, crouching, crawling, and "occasional use of the bilateral upper extremities." Tr. 24.

Ash contends that the ALJ failed to include in the RFC limitations arising from
fibromyalgia pain, upper extremity problems, migraines, and mental health symptoms.

## A. Fibromyalgia

Gordon Banks, M.D., Ph.D., diagnosed fibromyalgia in June 2009. Tr. 294. Ash
reported dizziness, headache, memory problems, tremors, uncontrolled movements, weakness,
back pain, neck pain, hip pain, fatigue and weight gain, for which she took oxycodone and
Oxycontin. Dr. Banks noted that fibromyalgia is a "disease of central sensitization, and thus we
don't like giving drugs that cause increased central sensitization, like oxycodone and oxycontin.
They oxycodone is worse. She should attempt to wean from these, even if she thinks they are
helping her. In the long run, they aren't and she won't get better if she doesn't." *Id.* Dr. Banks
prescribed Savella.

In July 2009 Dr. Banks noted "Savella has helped some," but Ash could not afford to
refill the prescription. Tr. 294.

8 - OPINION AND ORDER

In August 2009, Dr. Herd saw Ash to follow up on bilateral lower extremity pain. Tr.
394. Dr. Herd noted Ash's pain "is controlled with her current medications." *Id.* She was on a
pain contract and taking flexeril, oxycodone, OxyContin, and Savella.

In January 2010 Dr. Herd diagnosed depression, noting Ash "reports she [has] still been
unable to find work." Tr. 391. Dr. Herd prescribed Tegretol and recommended counseling.

In April 2010 Ash's chief complaint's were bilateral wrist pain and depression. Tr. 389.
Dr. Herd noted Ash "states she seems to be doing better with her depression at this time." *Id.*
Dr. Herd recommended Ash wear her wrist braces and referred her to rheumatology for her
fibromyalgia.

May 2010 bilateral wrist xrays showed "minimal osteoarthrosis." Tr. 415.

On December 3, 2010, Ash reported hearing voices and music for the past several
months. Tr. 385. Dr. Herd noted she was alert and oriented with a flat affect. Insight was
appropriate, and Dr. Herd referred her to psychiatry.

On December 22, 2010, Dr. Herd noted Ash's "pain has been controlled on the
OxyContin....Patient states she [is] stable on the OxyContin and wishes to stay on that at this
time." Tr. 383. Dr. Herd wrote "Fibromyalgia. I reviewed the records from Dr. Macasa. Patient
was negative for any rheumatological findings. Continue the OxyContin for now." *Id.*

None of the physicians identified functional limitations arising from Ash's fibromyalgia
except diffuse pain adequately controlled by pain medication. Plaintiff argues that her
fibromyalgia pain limits her to sedentary or less than sedentary work. However, on this record,
the ALJ did not err in finding no functional limitations arising from fibromyalgia.

/ / /

9 - OPINION AND ORDER

**B. Upper Extremity Limitations**

In February 2007 William DeBolt, M.D., a neurologist, examined Ash in an Independent Medical Evaluation. Tr. 441-48. Dr. DeBolt's impression was a diffuse and generalized inflammatory process affecting maximally the left elbow, producing an epicondylitis (tennis elbow), also on the right to a lesser degree. Tr. 446. Dr. DeBolt found "probable bicipital tendinitis," with limited motion of the left shoulder, decreased range of motion of the wrists causes by tenosynovitis with secondary carpal tunnel syndrome and evidence of ulnar nerve irritation at the ulnar groove, left greater than right. *Id.*

Dr. DeBolt recommended Ash have a complete internal medical evaluation to identify any systemic inflammatory disease that would account for the symptoms. Dr. DeBolt was not convinced that overwork on the computer and typing would account for Ash's symptoms, and noted that she "has been able to continue employment." *Id.* Dr. DeBolt identified functional limitations including limiting computer time and typing to two to three hours per day, no frequent lifting over 15 pounds, occasional lifting of 20 pounds, and no overhead work. Tr. 447. Dr. DeBolt opined that pushing and pulling with the upper extremities was reasonable.

On March 14, 2007, James Molloy, M.D., noted positive Phalen's and Tinel's signs and diagnosed carpal tunnel syndrome. Ash had pain in the wrists, tingling in the left fifth finger, and normal grip strength. Tr. 451.

On March 26, 2007, Dr. Molloy noted increasing pain and plaintiff's report that she was doing "a lot of sewing at home." Tr. 452. She had weak grip strength and Dr. Molloy provided cock up wrist splints. An April 2, 2007 chart note indicates Dr. Molloy would not "release her back to work until she is either pain-free off pain medications or is released by the orthopedist."

Tr. 454. Ash reported more pain in her shoulders and neck and less in her wrists. She was not wearing her wrist splints, and admitted to taking more medication than prescribed and working more than she should. Ash was unable to raiser her arms laterally to the horizontal. Tr. 455. Dr. Molloy prescribed physical therapy and no work.

Ash saw Orthopaedist George S. Zakaib, M.D., on April 6, 2007. Tr. 429-30. She had been off work for one week, had no numbness, and thought she could work. Shoulder xrays were negative. Dr. Zakaib's impression was probable bilateral carpal tunnel syndrome for which he recommended physical therapy and splints, and released Ash to work.

Ash continued to have carpal tunnel symptoms and right shoulder pain after the March 2008 car accident. In April 2010 Dr. Herd noted positive Phalen's and Tinel's signs bilaterally, diagnosed carpal tunnel syndrome, and recommended she wear wrist braces. Tr. 389.

May 2010 xrays revealed "minimal degenerative changes of the first metacarpal-carpal joint bilaterally," and the diagnosis was "minimal osteoarthrosis." Tr. 415.

In October 2010 Ash reported improved pain with wrist braces, but stated the pain was getting worse over time. Tr. 387. Dr. Herd recommended she wear the wrist braces.

Plaintiff contends that the ALJ's RFC limitation to "occasional use of the bilateral upper extremities" does not adequately account for her symptoms. She argues her symptoms would prevent even occasional, repetitive use of the bilateral hands for handling, gripping, or fingering, and points to her testimony that she "can't grip," and drops things with both hands though the dominant right hand is worse. Tr. 46.

The ALJ's determination that Ash is limited to occasional use of the bilateral upper extremities is supported by substantial evidence. The only evidence that Ash can't grip, handle or finger is her testimony that the ALJ properly found not fully credible.

## C. Migraines

In November 2006 Ash was seen in the emergency room for headache and right sided numbness. Tr. 213-15. A CT scan of her brain was negative.

On December 12, 2006, Lynn Hughes, F.N.P., saw plaintiff to follow up on medication management. Ash admitted she was taking propranolol to prevent migraines twice a day instead of three times as prescribed, and had a headache the previous day. Tr. 325. Nurse Hughes prescribed Cymbalta for anxiety.

On December 29, 2006, Ash reported continued migraines and taking propranolol once a day. Tr. 323.

In February 2007 Ash reported an increase in her migraine headaches. Tr. 321. She had run out of Cymbalta and not refilled the prescription due to the cost.

On September 24, 2007, Ash reported to Dr. Molloy a migraine of three days duration. Tr. 374.

In October 2007, Nurse Hughes saw plaintiff to follow up for migraine headaches and anxiety. Tr. 317-18. Ash reported Cymbalta was providing "great improvement" for anxiety, but felt propranolol was not working as well to prevent migraines. Ash reported a migraine over the Easter holiday (six months earlier) which had lasted three days. Nurse Hughes clarified that Ash could take up to three amitriptyline at night to help prevent migraines, instead of the one dose Ash was taking.

12 - OPINION AND ORDER

At a November 2008 appointment with John Ford, M.D., to follow up on treatment for her motor vehicle accident, Ash reported "some headaches." Tr. 278.

Ash testified that she gets at least two headaches each month which each last three to four days. Tr. 57. On this record, the ALJ's determination that Ash has no functional limitations arising from headaches is supported by substantial evidence. The ALJ properly found Plaintiff less than fully credible, and the allegations of the severity of her headaches is not supported by the medical evidence.

**D. Mental Health Symptoms**

Plaintiff argues she has mental symptoms that impact her ability to respond appropriately to supervision, coworkers, and usual work situations. She contends she is chronically irritable and angry, prone to angry outbursts, and has difficulty leaving home due to anxiety and depression. Ash contends that she is tangential, experiences audio hallucinations, and is chronically suicidal, all of which impair her ability to perform unskilled work.

On December 3, 2010, Ash told Dr. Herd she had been hearing voices and music for several months. Tr. 385. Dr. Herd noted she was stable, alert, oriented, and her insight was appropriate, and he referred her to psychiatry. On December 22, 2010, Ash again reported aural hallucinations to Dr. Herd, and he again noted she was stable, alert, and oriented, with a flat affect. Tr. 383.

On January 27, 2011, Ash was evaluated by Raina L. Banu-Clayton, M.S.W., C.S.W.A. Tr. 306-10. Ms. Banu-Clayton noted diagnostic clarification would be sought from Dr. Goldsmith with respect to Ash's report of Bipolar Disorder because Ash "did not appear to meet the criteria for Bipolar Disorder during initial assessment with this clinician." Tr. 309. Ms.

13 - OPINION AND ORDER

Banu-Clayton stated that Ash's symptoms "appear to vary from mild to severe in terms of functional impairment." Tr. 310. She noted impaired recent and remote memory, rapid speech, impaired judgment, depressed and anxious mood, suicidal ideation, and tangential thought process. Tr. 307. Her diagnostic impressions were Bipolar Disorder, NOS, per client report; Major Depressive Disorder, Recurrent, Moderate, Chronic; and Posttraumatic Stress Disorder. Ms. Banu-Clayton assessed a GAF score of 50.

On June 2, 2011, Ash was evaluated by Steven Goldsmith, M.D. Tr. 300-01. Dr. Goldsmith noted Ash was alert, calm, with normal speech and logical associations. Her memory for recent events was grossly intact. He diagnosed Bipolar II disorder, depressed, and assessed a GAF of 45. Dr. Goldsmith prescribed lamicatal and Klonopin.

On June 7, 2011, Ash saw Joseph B. Arnold, M.D., for medication management. Tr. 472-73. Dr. Arnold noted depression and anxiety, but no psychotic symptoms. Ash had developed a rash and discontinued the lamictal and Klonopin. Dr. Arnold had her restart the Klonopin and prescribed Tegretol which Ash reported helped control her moods and induced sleep without side effects.

On June 20, 2011, Dr. Goldsmith noted Ash was "highly depressed with intermittent intense pds of anger, rapid cycling of these states, insomnia, anxiety." Tr. 474. He stated Ash was highly anxious, slightly agitated, and depressed, with normal speech, logical associations, and impaired concentration. *Id.* Dr. Goldsmith stopped the Tegretol and started Seroquel.

The ALJ noted the June 2, 2011 report of grossly intact recent memory functions, and found Ash had a mildly impaired ability to maintain concentration, persistence, or pace. Tr. 24. The ALJ's determination is supported by substantial evidence.

### III. Lay Testimony

The ALJ has a duty to consider lay witness testimony. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition. *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993). The ALJ may not reject such testimony without comment and must give reasons germane to the witness for rejecting her testimony. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). However, inconsistency with the medical evidence may constitute a germane reason. *Lewis*, 236 F.3d at 512. The ALJ may also reject lay testimony predicated upon the testimony of a claimant properly found not credible. *Valentine v. Astrue*, 574 F.3d 685, 694 (9th Cir. 2009).

Beverly Johnson completed a Third Party Report on March 30, 2009. Tr.156-63. Ms. Johnson reported that Ash functioned slowly and required assistance with household activities like carrying laundry.

The ALJ failed to discuss this lay witness statement. This was error. *Lewis,* 236 F.3d at 511. However, this error was harmless because the ALJ provided adequate reasons to reject Plaintiff's own testimony, which was similar to the lay testimony. *Molina v. Astrue,* 674 F.3d 1104, 1121-22 (9th Cir. 2008).

/ / /

/ / /

/ / /

/ / /

/ / /

15 - OPINION AND ORDER

**CONCLUSION**

For these reasons, the ALJ's decision that Ash is not disabled is based on correct legal standards and supported by substantial evidence. The decision of the Commissioner is affirmed.

IT IS SO ORDERED.

Dated this 8 day of April, 2014.

JAMES A. REDDEN
United States District Judge